SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**ANDREW T. HO, OSB #185047**
Assistant United States Attorney
Andrew.Ho@usdoj.gov
**GWENDOLYN RUSSELL**
Special Assistant United States Attorney
Russell.Gwendolyn@epa.gov
1000 SW Third Ave, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **3:25-cr-00295-IM** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **KAYLA HARTLEY,** | **Sentencing: May 12, 2026 at 2:00 p.m.** |
| **Defendant.** | |

## I.      INTRODUCTION

Defendant Kayla Hartley, Director of Operations at Northwest Slurry Solutions and

Hydro Excavation, LLC ("Northwest Slurry"), intentionally caused the discharge of

approximately 500,000 gallons of industrial wastewater contaminated with hydrofluoric acid and

toxic metals to the sanitary sewer without approval from the publicly owned treatment works

("POTW").  The wastewater was generated by Precision Castparts Corporation ("PCC"), who

previously disposed of it through a permitted waste management company, NRC Environmental

Services ("NRC").  Hartley was familiar with PCC's wastewater through her prior employment

at NRC, and solicited the contract from PCC to dispose of their wastewater at Northwest Slurry

**Government's Sentencing Memorandum**                                                    **Page 1**

at a lower cost.  She disposed of the wastewater despite knowing that Northwest Slurry had never received a permit from the POTW for this wastewater.

Under the management of Hartley and an unindicted co-conspirator, the PCC wastewater was accepted, stored in tanks, and then piped into the Northwest Slurry facility using a hose inserted through a hole in the wall that led to a sewer drain inside the facility.  Hartley attempted to conceal the illicit dumping by telling the POTW that Northwest Slurry was not discharging to the sanitary sewer.  Hartley knowingly placed corporate profit over compliance with pretreatment standards that protect the POTW, the environment, and the public from the serious risks posed by the covert dumping of industrial wastewater.

On April 27, 2026, the United States Probation and Pretrial Services Office ("Probation") disclosed its Presentence Report ("PSR") and Sentencing Recommendation ("Rec.") for Hartley. Probation calculated Hartley's total offense level under the United States Sentencing Guidelines (the "Guidelines") as 15 and her criminal history as Category I, resulting in a Guidelines range of 18-24 months.  (PSR ¶ 7).  Additionally, in its Sentencing Recommendation, Probation recommended that the Court impose five years' probation, a fine of $25,000, and a special fee assessment of $100.  (Rec. at 1).

For the reasons articulated in this sentencing memo, the government recommends for Hartley: (1) five months' imprisonment followed by a three-year term of supervised release that includes five months' home detention as a condition of supervised release, in addition to the conditions of supervision recommended by Probation (Rec. at 3-6), (2) a fine of $25,000, and (3) a special fee assessment of $100.  The parties jointly recommend a term of three years of supervised release following any term of imprisonment, or five years of probation if the Court does not impose a term of imprisonment.

**Government's Sentencing Memorandum**                                                    **Page 2**

## II.     CLEAN WATER ACT AND PERMITTING BACKGROUND

The Clean Water Act, originally passed as the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*, was intended to restore and maintain the chemical, physical, and biological integrity of the nation's waters.  (PSR ¶ 19).  POTWs such as Clean Water Services ("CWS") operate sanitary sewer systems pursuant to National Pollutant Discharge Elimination System ("NPDES") permits issued by EPA or authorized state.  (PSR ¶ 20-21).  Pursuant to the Clean Water Act, EPA promulgated national pretreatment standards for the introduction of pollutants generated by industrial (non-domestic) users to POTWs.  33 U.S.C. § 1317(b); 40 C.F.R. § 403.5.

National pretreatment standards include general prohibitions that prevent the introduction of pollutants into POTWs which will pass through or interfere with such treatment works, as well as specific prohibitions against the discharge of pollutants that pose risks to the POTW such as corrosion, fire or explosion, and danger to worker health and safety.  40 C.F.R. § 403.5(a)-(b); 70 Fed. Reg. 60134, 60136 (Oct. 14, 2005).[1]  The specific pretreatment standards include a prohibition against the introduction of trucked or hauled pollutants to a sewer system at a discharge point not designated by the POTW to receive such wastes.  40 C.F.R. § 403.5(b)(8). (PSR ¶ 21).  Consistent with this standard, CWS' permitting program prohibits the discharge of industrial wastewater to the sanitary sewer without a discharge permit. (PSR ¶ 21).

In November 2019, Northwest Slurry applied to CWS for a discharge permit for wastewater generated by dewatering slurry.  (PSR ¶ 18; Plea Agreement, ECF No. 19 ¶ 5.E (hereinafter "Plea")).  The application was submitted by Northwest Slurry's Director of

---

[1] *See* CWS, https://cleanwaterservices.org/industry/pretreatment/ (last visited April 23, 2026).

**Government's Sentencing Memorandum**                                    **Page 3**

Engineering, Tim Bauters.  (HARTLEY_0001977).  Bauters passed away in February 2020.  (PSR ¶ 40).  Following his passing, Northwest Slurry requested a meeting with CWS about the pending permit application.  (HARTLEY_0001977).  On February 20, 2020, CWS regulators met with representatives of Northwest Slurry, including Hartley, to discuss the permit application.  (HARTLEY_0001977; HARTLEY_0002185).  The regulators explained that the facility could not discharge to the sanitary sewer until CWS issued a permit to discharge.  (HARTLEY_0002185).  They further explained that the current permit application only covered hydro-excavation slurry wastewater and would not cover industrial wastewater from any other process.  (*Id.*)

In May 2020, Hartley submitted an updated application to CWS for a discharge permit, again only requesting permission to discharge wastewater from dewatering slurry.  (PSR ¶ 25; Plea ¶ 5.G).  The application represented that Northwest Slurry would only discharge wastewater from processing "clean slurry" and "oily slurry" to the sanitary sewer.  (PSR ¶ 25).  Neither of the permit applications would have allowed Northwest Slurry to process and discharge contaminated industrial wastewater generated by another business such as PCC.  (PSR ¶ 25; Plea ¶ 5.E-G).  Moreover, CWS did not actually issue a discharge permit to Northwest Slurry.  (PSR ¶ 24; Plea ¶ 5.G).

Suspecting that Northwest Slurry may have been discharging to the sanitary sewer despite not receiving a permit, CWS installed a flowmeter downstream of the facility in September 2020.  (PSR ¶ 28-29).  The flowmeter recorded periods of flow exceeding the level common for the sewer line.  (PSR ¶ 29).  CWS conducted a site visit at Northwest Slurry in November 2020.  (PSR ¶ 31; Plea ¶ 5.J).  During the meeting, Hartley misled the regulators about the facility's operations.  She falsely claimed that the facility was in "demo mode," was

**Government's Sentencing Memorandum**                                           **Page 4**

close to being ready to discharge to the sanitary sewer, and was not accepting hauled waste from other facilities, just recirculating material that was onsite to test the facility's slurry dewatering operations. (PSR ¶ 31).

### III.    OFFENSE CONDUCT

Northwest Slurry was an Oregon-based company formed in September 2019 to receive, process, and dispose of hydro-excavation slurry. (PSR ¶ 18; Plea ¶ 5.A). Hartley was the company's Director of Operations. (PSR ¶ 18). As summarized above, Northwest Slurry submitted applications for a permit to discharge wastewater from hydro-excavation slurry to the sanitary sewer in November 2019 and May 2020. (PSR ¶ 18, 25; Plea ¶ 5.E-G). During the application process, CWS advised facility representatives, including Hartley, about the limited scope of the permit, should it be issued. (PSR ¶ 24; HARTLEY_0002185).

In August 2020, the Environmental Protection Agency's Criminal Investigation Division ("EPA CID") received a complaint that Northwest Slurry was accepting contaminated industrial wastewater from PCC without a discharge permit. (PSR ¶ 22). EPA CID's investigation revealed that in August 2019, Hartley began marketing Northwest Slurry as a company that could accept industrial wastewater for disposal. (Plea ¶ 5.D). As a result of her conduct, Northwest Slurry entered into agreements with customers that produced industrial wastewater, including PCC. (PSR ¶ 34-35, 40; Plea ¶ 5.D).

PCC generated wastewater from its manufacturing process etching titanium parts for airplane engines. (PSR ¶ 23). The wastewater contained hydrofluoric acid and heavy metals, including molybdenum, titanium, vanadium, arsenic, cadmium, chromium, and silver. (PSR ¶ 23; Plea ¶ 5.D; HARTLEY_0000088; HARTLEY_0000649-650; HARTLEY_0000663; HARTLEY_0066427). These contaminants pose risks to human health and the environment.

**Government's Sentencing Memorandum**                                    **Page 5**

Hydrofluoric acid is highly dangerous because it "is corrosive and destroys tissue even as dilute solutions. It readily penetrates human skin, allowing it to destroy tissues, decalcify bone and interfere with nerve function." University of Washington, Environmental Health & Safety, HYDROFLUORIC ACID (HF) (May 2017).[2] Additionally, CWS has set a local limit for molybdenum applicable to significant industrial users of 0.56 mg/L.[3] Laboratory analysis of PCC's wastewater showed molybdenum in the amount of 60.7 mg/L, far exceeding the local limit. (HARTLEY_0000663). Moreover, several of the metals in the wastewater, including arsenic, cadmium, chromium, and silver, are designated as toxic pollutants under the Clean Water Act. *See* 40 C.F.R. § 401.15.

EPA CID's investigation established that it was Hartley's idea to obtain the contract to dispose of PCC's wastewater. PCC was unable to obtain a sanitary sewer discharge permit for the wastewater due to the molybdenum content and was required to dispose of its wastewater offsite with a disposal facility. (HARTLEY_0000610). PCC previously disposed of its wastewater through the waste disposal company NRC. (PSR ¶ 35; HARTLEY_0002832; HARTLEY_0000632). Hartley was formerly a manager at NRC, where she handled the PCC account. (PSR ¶ 35, 46, 88; HARTLEY_0002832). When Hartley left NRC for Northwest Slurry, she approached the waste hauler Tidewater Environmental about obtaining the PCC waste contract. (PSR ¶ 46; HARTLEY_0000632). Northwest Slurry and Tidewater Environmental then approached PCC about disposing of the waste at Northwest Slurry's facility for a lower price than NRC. (HARTLEY_0000632; HARTLEY_0000608).

---

[2] Available at https://www.ehs.washington.edu/system/files/resources/Focus_Sheet-HF.pdf (last visited April 23, 2026).

[3] *See* CWS, https://cleanwaterservices.org/industry/pretreatment/ ("What are the local limits?") (last visited April 23, 2026).

**Government's Sentencing Memorandum**                                    **Page 6**

Hartley and Bauters gave a presentation to PCC about how Northwest Slurry could treat PCC's waste, including removing the metals in the wastewater before discharge to the sanitary sewer. (PSR ¶ 35). They presented a process in which the wastewater would be treated with polymer and then processed through a centrifuge to settle out metals before discharge to the sanitary sewer. (HARTLEY_0002829; HARTLEY_0002874). PCC's wastewater was not hydro-excavation slurry, the material for which the facility had sought a permit, nor had the facility received any permit at all. (Plea ¶ 5.D, G).

Nevertheless, in December 2019, Hartley told the waste hauler that Northwest Slurry could accept up to 15,000 gallons of PCC's industrial wastewater per day. (PSR ¶ 40). In an email exchange in January 2020, Hartley and colleagues at Northwest Slurry discussed the corrosive nature of PCC's waste. (HARTLEY_0002954-2956.) Bauters called attention to the fact that the PCC wastewater was "super corrosive liquid" that was "used for 'acid etching away' metal." (*Id.*). Colleagues joked about the potential for an incident that would lead to press coverage due to the hazardous nature of the wastewater. (*Id.*). Hartley wrote, "I don't want to go to jail." (*Id.*)

Over the course of the next five months, from February 2020 through September 2020, Northwest Slurry accepted and discharged 499,293 gallons of PCC's corrosive industrial wastewater without a permit. (PSR ¶ 37; Plea ¶ 5.H). Hartley subsequently admitted to investigators that the PCC waste was stored in tanks outside one of the buildings at the facility and discharged to a sewer drain inside the building using a hose that ran from the tanks, through a hole in the wall, to the drain. (HARTLEY_0002831, HARTLEY_0002836). She further admitted that Northwest Slurry did not follow the treatment process they presented to PCC and never put the wastewater through a centrifuge prior to discharge. (HARTLEY_0002831). She

**Government's Sentencing Memorandum**                                                    **Page 7**

also explained that the tanks that stored PCC's wastewater at the facility had to be lined because the wastewater caused corrosive damage to unlined tanks.  (HARTLEY_0002831).  Northwest Slurry stopped accepting PCC's waste at its Hillsboro facility in September 2020 after an employee found a CWS monitoring device in the sewer line outside the facility.  (PSR ¶ 28-29, 45 ; Plea ¶ 5.I).

## IV.    THE PRESENTENCE REPORTS

On April 27, 2026, Probation disclosed the PSR to the parties and issued its Sentencing Recommendations.

### A.    Defendant Hartley's Total Offense Level Is 15

In the PSR, Probation concluded that Hartley's total offense level is 15, calculated as follows:

| Description | Offense Level | Guideline Section |
| --- | --- | --- |
| Base Offense Level | 8 | U.S.S.G. §2Q1.2(a) |
| Ongoing Discharge | +6 | U.S.S.G. §2Q1.2(b)(1)(A) |
| Disposal Without a Permit | +4 | U.S.S.G. §2Q1.2(b)(4) |
| Acceptance of Responsibility | -3 | U.S.S.G. §3E1.1 |
| **Total:** | **15** | |

### B.    Defendant Hartley Is in Criminal History Category I

The PSR concluded that defendant is in criminal history category I because defendant has a criminal history score of one.

### C.    Probation Recommended a Sentence of Five Years of Probation and a $25,000 Fine

With a total offense level of 15 and a criminal history category of I, Probation determined that defendant fell within an advisory Guidelines range of 18-24 months.  Probation

**Government's Sentencing Memorandum**                                **Page 8**

recommended a sentence of: (1) five years of probation, (2) a $25,000 fine, and (3) a $100 fee assessment.  The government agrees with the guidelines calculation, criminal history category, and fine recommendation in the PSR.  However, as discussed more fully below, and consistent with the advisory Guidelines, the government recommends five months' imprisonment followed by a three-year term of supervised release that includes five months' home detention.

## V.     THE UNITED STATES' RECOMMENDED SENTENCE AND SECTION 3553(a) ANALYSIS

The basis for the recommended sentence in this matter is laid out below, organized by relevant sentencing factors.

### A.     Nature of the Offense and Characteristics of the Defendant

As set forth above, over the course of approximately 8 months, Hartley caused the illicit discharge of approximately 500,000 gallons of PCC's industrial wastewater to the sanitary sewer at a location not designated for such discharges by the POTW.  Hartley had proactively solicited the contract to dispose of PCC's wastewater, causing PCC to stop disposing of the waste through her former employer NRC and shift the contract to her new employer Northwest Slurry.  She did so despite knowing that Northwest Slurry did not have an industrial wastewater discharge permit, and that its pending permit application would not cover PCC's wastewater.  She was also well aware that PCC's wastewater was corrosive and contaminated with heavy metals, and that Northwest Slurry was not following the treatment method she and a colleague had presented to PCC to obtain the waste disposal contract.  Yet it was not the lack of permit or treatment that caused Hartley and her coconspirators to stop accepting PCC's waste—only the fear of getting caught when they discovered that the POTW was monitoring the sewer line.  And when the POTW became concerned about potential illegal discharging at the facility and conducted a site

visit, Hartley misled the regulators, falsely stating that the facility was not yet discharging to the sanitary sewer and was not accepting hauled waste from other facilities.

Hartley played a central role in the conspiracy to illegally dump PCC's waste in violation of the Clean Water Act. However, pursuant to the plea agreement, the government recommends an additional three-level downward variance for her early resolution of this case. A three-level downward variance would result in a total offense level of 12, where Hartley's guideline range would be 10-16 months. That guideline range falls within Zone C, where home detention may be substituted for imprisonment as a condition of supervised release provided that at least one-half of the minimum term is satisfied by imprisonment. U.S.S.G. §5C1.1(d)(2). The government recommends that the Court sentence Hartley to five months' imprisonment followed by a three-year term of supervised release that includes five months' home detention as a condition of supervised release and a fine of $25,000.

### B.    Seriousness of the Offense, Deterrence, and Protecting the Public

The environmental regulatory system that has been adopted in the United States is, in large part, a self-policing one. There are a relatively small number of EPA inspectors and investigators and they rely upon the regulated community to follow the law, as established by Congress. National pretreatment standards prevent facilities such as Northwest Slurry from discharging harmful pollutants that may pass through or interfere with POTW, allowing pollutants to enter receiving waters such as the Tualatin River untreated. The standards also protect POTW workers and equipment from encountering dangerous discharges. It is critical for POTWs to be informed of industrial waste streams so they can evaluate whether to permit the discharge to the sanitary sewer, and if so, the terms of the permit for that particular waste.

**Government's Sentencing Memorandum**                                           **Page 10**

Here, Hartley intentionally circumvented that permitting process, caused the discharge of corrosive wastewater containing toxic metals to the sanitary sewer, and concealed the unauthorized discharges from the POTW.  In doing so, she deprived CWS of the opportunity to identify concerns about the pollutants in the waste, determine whether its discharge would be permitted, and impose any pretreatment requirements necessary to protect the POTW, environment, and public health.  It is important for this Court to fashion a sentence that not only reflects the serious nature of the environmental offenses, but also ensures that others committing similar offenses are deterred.  The defendant and the larger regulated community must fully understand that the intentional flouting of environmental rules will not be tolerated.

### C.      Kinds of Sentences Available

The government is not aware any previous cases in Oregon involving an individual who pleaded guilty to the specific charge in this case, Conspiracy to Violate the Clean Water Act's Pretreatment Standards, in violation of 18 U.S.C. § 371.  However, there are multiple cases in the Ninth Circuit in which an individual has pleaded guilty to the predicate offense, a felony violation of the Clean Water Act's Pretreatment Standards.  Sentences in these cases range from probation and a fine to incarceration.

For example, in a case in the District of Oregon, *United States v. Paul Hardman*, 05-CR-362 (D. Or. 2006), a company official at a grease removal company that discharged grease at interceptors that were not designated discharge points was sentenced to two years' probation and a fine of $2,000.  However, a case more comparable to this one is the Central District of California's prosecution in *United States v. Fernando Salazar*, 12-CR-00145 (2012) and *United States v. Juan Carlos Hernandez-Ocequera*, 12-CR-00148 (2012).  In that case, the operator of a metal plating shop and one of his employees were prosecuted for the discharge of corrosive and

**Government's Sentencing Memorandum**                                                    **Page 11**

toxic industrial wastes contaminated with heavy metals to the sanitary sewer without a permit. The discharging was conducted secretly using a hose to pump the waste down the facility's toilet. The operator was sentenced to two years' incarceration, one year of probation, and a $30,000 fine. The employee was sentenced to 1 month of incarceration followed by one year of probation, with seven months to be served in home confinement. Similarly, here, Hartley caused the discharge of corrosive industrial waste contaminated with heavy metals via a covert hose that led through a wall into a drain inside the facility, all while misleading regulators to cover up the illicit discharging.

There was also a more recent case with similar facts in the Western District of Washington, *United States v. Sanft et al*, 2:19-CR-00258 (2021). In that case, the operator of a drum reconditioning facility and the facility manager were charged with Conspiracy, Clean Water Act violations, and False Statements under 18 U.S.C. § 1001. The government's investigation revealed that the defendants caused employees to discharge corrosive wastewater to the sanitary sewer without a permit using a hidden drain in the facility. They also misled regulators about the discharges by claiming that the facility did not discharge to the sewer. The operator was convicted of all counts following a jury trial and sentenced to 18 months in prison, a $250,000 fine, and three years of supervised release. The facility manager pleaded guilty to two counts and was sentenced to 30 days' incarceration and one year of supervised release.

Based on the foregoing cases, a sentence of five months' imprisonment followed by a three-year term of supervised release with five months' home detention and a $25,000 fine is within the range of sentences imposed on similarly situated defendants.

## VI.    FINES AND SPECIAL ASSESSMENTS

The Sentencing Guidelines provide that, for individual defendants, "the court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2.  The guidelines further provide that "the amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." USSG § 5E1.2(d).  The maximum fine for an individual convicted of a felony offense is not more than $250,000.  18 U.S.C. § 3571(b)(3).

The guidelines provide an advisory guideline for fines to be paid by individuals. USSG § 5E1.2(c).  Here, the fine table advises a minimum fine of $5,500 and maximum fine of $55,000 for an offense level of 12.  USSG § 5E1.2(c)(3).  Consistent with the fine recommendation in the PSR, the government recommends that the Court impose fine of $25,000 against Hartley, well-within the statutory maximum and advisory guideline.  Additionally, a special assessment of $100 special assessment must be imposed.  18 U.S.C. § 3013(a)(2)(A).

/ / / /

/ / / /

/ / / /

/ / / /

**Government's Sentencing Memorandum**                                                               **Page 13**

## VII.    CONCLUSION

For the foregoing reasons, the Court should sentence defendant to: (1) five months' imprisonment followed by a three-year term of supervised release that includes five months' home detention as a condition of supervised release, in addition to the conditions of supervision recommended by Probation (Rec. at 3-6), (2) a fine of $25,000, and (3) a special fee assessment of $100.  The parties jointly recommend a term of three years of supervised release following any term of imprisonment, or five years of probation if the Court does not impose a term of imprisonment.

DATED: May 4, 2026.

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

/s/ Andrew T. Ho
ANDREW T. HO, OSB #185047
Assistant United States Attorney

/s/ Gwendolyn Russell
GWENDOLYN RUSSELL
Special Assistant United States Attorney

**Government's Sentencing Memorandum**                                                    **Page 14**