JEFFREY A. TURNOY, OSB 124814
MARK C. COGAN, OSB 920167
1500 SW FIRST AVENUE, SUITE 1150
PORTLAND, OR 97201
503-827-8092
email: jeff@coganlawoffice.com
ATTORNEYS FOR DEFENDANT KAYLA HARTLEY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE No. 3:25-CR-00295-IM |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S SENTENCING |
| vs. | ) | MEMORANDUM |
| | ) | |
| KAYLA HARTLEY, | ) | |
| Defendant. | ) | |

A.    INTRODUCTION

This matter is pending for imposition of sentence on May 21, 2025. The purpose of this

pleading is to summarize the reasons we intend to present in favor of imposing a sentence lower

than what is prescribed by the sentencing guidelines, consistent with the considerations in 18

U.S.C. § 3553(a).

Ms. Hartley was charged by Indictment and pleaded guilty to one count of Conspiracy to

Commit a Clean Water Act Violation, pursuant to 18 U.SC. § 371. She remains out of custody,

and awaits imposition of sentence.

B.    ADVISORY SENTENCING GUIDELINES BASE CALCULATIONS

We do not dispute the benchmark advisory Sentencing Guidelines calculations which are

reflected in the Pre-Sentence Report. Indeed, the advisory Sentencing Guidelines for Conspiracy

DEFENDANT'S SENTENCING MEMORANDUM                                                                                      1

to Commit a Clean Water Act Violation do reference a Base Offense Level of 8. See U.S. SENTENCING GUIDELINES MANUAL § 2Q1.2(a). There is no dispute that a 6-level increase applies for ongoing discharge. See id. at § 2Q1.2(b)(1)(a). There is no dispute that a 4-level increase applies for disposal without a permit. See id. at § 2Q1.2(b)(4). Further, there is no dispute that a 3-level decrease applies for acceptance of responsibility. See id. at § 3E1.1(b). Thus, the advisory guideline range for Conspiracy to Commit a Clean Water Act Violation, prior to further departures or variances, is level 15, which prescribes an advisory sentence of 18 to 24 months.

## C.    DEPARTURES AND CRIMINAL HISTORY CALCULATION

Based on Ms. Hartley's acceptance of responsibility, there is no dispute that Ms. Hartley qualifies for a 3-level reduction for Acceptance of Responsibility, resulting in an adjusted offense level of 15. See id. at § 3E1.1(b). There is further no dispute that Ms. Hartley has a criminal history category I, as she has one prior criminal history point. As such, Ms. Hartley's criminal history score is 1, with category I.

## D.    RECOMMENDED SENTENCE

The Probation Department is seeking imposition of a sentence of 5 years of probation, with a fine of $25,000. No custodial sentence is recommended by the Probation Department. Via the Plea Agreement, the government has agreed not to seek a prison sentence any higher than the low-end of the applicable guideline range, which is 18 months, prior to further adjustments. However, the government's recommendation via their sentencing memorandum is 5 months in prison with 5 months of home-detention, due to further agreed-upon adjustments to the guideline, which reflect Ms. Hartley's early resolution of the case, and otherwise. The plea agreement, and the law, do not require the Court to impose any custodial sentence. Further, there

is no mandatory minimum sentence applicable to this case. The defense urges the Court to impose a sentence of probation, based on the following considerations.

E.        SENTENCING CONSIDERATIONS

Before going into the specific reasons calling for imposition of a probationary sentence, as recommended by the Probation Department, it is important to make some general observations. The advisory Sentencing Guidelines are *ab initio* the product not solely of careful analysis and consideration of empirical data, but they are also the consequence of political guessing. The crude methodology used to create the Sentencing Guidelines was one of simple arithmetic averaging and addition; the Sentencing Commission simply took the average national sentences for a given offense, and then increased the incarceration term, without explanation, much less scientific studies. See U.S. v. Jaber, 362 F. Supp. 2d 365, 374 (D. Mass. 2005).

This methodology is painfully deficient as an intellectual exercise, and has the effect of compressing the varied actions of individuals and their attendant circumstances. In other words, the effect of averaging raises the floor for those whose criminality is relatively minimal and reduces the ceiling for those whose criminality is relatively greater. Combine this averaging with the wide variance associated with certain types of offenses, e.g. quantity defined drug offenses or loss-based theft/embezzlement, and you have a further disassociation of considerations of the offender and the punishment imposed.

Ms. Hartley is 35 years of age. Under the recommendation of the government, Ms. Hartley will continue to be in her mid-30s when released. The outlook for a 30+-year-old felon, just released from prison, poses an interesting dichotomy– because of her age, she is less likely

to re-offend, as recidivism rates decline relatively consistently as age increases[1] (good), but her incarceration severely damages her prospects for social re-integration (bad)[2]. Most inmates do not leave prison transformed into law-abiding citizens, but rather, the very skills an inmate develops to survive inside prison make them anti-social when released. An unintended consequence of incarceration to be sure, but not easily ignored.

Perhaps, given the unscientific nature of the formulation of the Sentencing Guidelines, the physician's credo *primum non nocere* ("Above all, do no harm"), may offer some perspective. This simple phrase reminds the physician that they must consider the possible harm that any intervention might do. It is invoked when debating the use of an intervention that carries an obvious risk of harm but a less certain chance of benefit. Historically, this phrase has been for physicians a hallowed expression of hope, intention, humility, and recognition that human acts with good intentions may have unwanted consequences.

In addition, as a global consideration, criminal justice reform has been and continues to be a major topic of political discussion. As American mass incarceration has been increasingly criticized, legislation has been crafted and executed to create reasonable and much-needed change to reflect not only the changing attitudes of those in power, but also to put measures into place that enable pro-social reform. There has been no greater example of this than with the passing and implementation of the First Step Act, signed into law in December of 2018.

---

[1] UNITED STATES SENTENCING COMMISSION, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES, at 12, 28 (2004), http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_History.pdf.

[2] Testimony of Pat Nolan, Vice President of Prison Fellowship to The Joint Economic Committee of the U.S. Congress "Mass Incarceration in the United States: At What Cost?" October 4, 2007.

As the President stated at the time in April of 2019, "Americans from across the political spectrum can unite around prison reform legislation that will reduce crime while giving our fellow citizens a chance at redemption." THE WHITE HOUSE, PRESIDENT DONALD J. TRUMP IS COMMITTED TO BUILDING ON THE SUCCESSES OF THE FIRST STEP ACT (2019), *available at* https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-committed-building-successes-first-step-act/. The First Step Act provides for greater earned time, rehabilitative programs, more availability for home-detention, and other reforms, including certain changes to mandatory-minimum sentences. Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person (First Step) Act, S. 756, 115 Cong. §§ 101, 401–613 (2018). The broader context of Federal sentencing and these recent reforms advise us that sentences should be reduced, programs should be made available, and the days of simply locking offenders away should be a relic of the past. It is within this enlightened context that Ms. Hartley stands to be sentenced.

F.    GROUNDS FOR ADDITIONAL DOWNWARD ADJUSTMENT OF SENTENCE

Pursuant to 18 U.S.C. § 3553(a), the Court is required to "impose a sentence sufficient, but not greater than necessary," to advance the sentencing policies and objectives which are provided by law. The sentencing criteria include the need to reflect the seriousness of the offense, to promote respect for the law, to provide for just punishment, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The plea agreement authorizes Ms. Hartley to request additional downward adjustments of her sentence, beyond those to which the government has stipulated and the Probation

DEFENDANT'S SENTENCING MEMORANDUM                                                  5

Department has recommended. We urge the Court to adjust the sentence downward based on a combination of factors, including the sentencing policies which are established in 18 U.S.C. § 3553(a).

### 1. The Advisory Guideline is too Harsh, Excessive, or is "Greater than Necessary," and the Purpose of Sentencing is Satisfied by a Sentence Below the Guidelines[3]

"Too many people go to too many prisons for far too long for no good law enforcement reason. It is time to ask ourselves some fundamental questions about our criminal justice system. Statutes passed by legislatures that mandate sentences, irrespective of the unique facts of an individual case, too often bear no relation to the conduct at issue, breed disrespect for the system, and are ultimately counterproductive. It is time to examine our systems and determine what truly works."

Eric Holder, U.S. Att'y Gen, Address at the 15th Annual National Action Network Convention (Apr. 04, 2013), *available at* http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130404.html.[4]

Retired United States Supreme Court Justice Anthony Kennedy has stated on several occasions that the guidelines are too harsh, sentences too long, the guidelines should be revised downward, and the fact that there is a lobby for higher penalties is "sick." See Anthony Kennedy, U.S. Supreme Court J., *Judicial Security and Independence*, C-SPAN (Feb. 14, 2007), http://www.c-spanvideo.org/program/196657-1; Anthony Kennedy, U.S. Supreme Court J., Address at the Ninth Circuit Judicial Conference (July 09, 2006), *available at*

---

3 See U.S. v. Rita, 551 U.S. 338, 351 (2007) (the judge "may hear arguments by prosecution or defense that the Guidelines sentence should not apply...because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations or perhaps because the case warrants a different sentence regardless.").

4 See TRANSFORMING PRISONS, RESTORING LIVES: FINAL RECOMMENDATIONS OF THE CHARLES COLSON TASK FORCE ON FEDERAL CORRECTIONS xi, 20 (2016) (The Task Force's first recommendation is that prison space be reserved only for those convicted of the most serious federal crimes, prison alternatives are recommended as opposed to prison, and incarceration, because it is highly punitive, costly, and a potentially harmful intervention, should be used sparingly and judiciously.).

http://www.talkleft.com/story/2006/07/11/842/04331/inmatesandprisons/Justice-Kennedy-Calls-Efforts-to-Increase-Sentences-Sick-; Anthony Kennedy, U.S. Supreme Court J., Address at the ABA Annual Conference (Aug. 09, 2003), *available at* http://www.abanow.org/2003/08/speech-by-justice-anthony-kennedy-at-aba-annual-meeting/; see also Kimbrough v. U.S., 552 U.S. 85, 111, 128 S. Ct. 558, 575 (2007) (district court's below guideline sentence in drug case not unreasonable because "it appropriately framed its final determination in line with §3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish" the goals of sentencing.); U.S. v. Germosen,  473 F. Supp. 2d 221, 227 n.11 (D. Mass. 2007) ("While before the Guidelines nearly 50% of federal defendants were sentenced to probation, *see* Bureau of Justice Statistics Sourcebook 1994, table 5.27, USSC Annual Report, table B-7 (providing rates of imprisonment from 1984-1989), afterwards it was only 15%. U.S.S.C. 1996 Sourcebook of Federal Sentencing Statistics, 20.")).[5]

The advisory guideline in this case calls for a sentence of 10 to 16 months in prison. The Probation Department is recommending a sentence of 5 years of probation with a $25,000 fine, and the government is recommending 5 months, followed by 5 months of home-detention. As such, pursuant to the guidelines and the government's recommendation, Ms. Hartley is at risk of going to prison. The defense submits that any amount of prison time is overly harsh, excessive, and "greater than necessary" to achieve the purposes of sentencing.

---

5 See also Timothy Williams, *Police Leaders Join Call to Cut Prison Rosters*, N.Y. TIMES, Oct. 20, 2015, http://www.nytimes.com/2015/10/21/us/police-leaders-join-call-to-cut-prison-rosters.html?emc=edit_th_20151021&nl=todaysheadlines&nlid=26951077&_r=1 (More than 130 law enforcement officials, including top police chiefs and district attorneys, have formed a group called Law Enforcement Leaders to Reduce Crime and Incarceration to call upon Congress and State and local governments to implement programs and laws to reduce the massive amount of persons incarcerated throughout the United States. The group's aim is to use programs, rather than incarceration, to handle offenses involving minor drug possession, theft, and other low-level offenses where treatment and/or crisis management benefits the community more than jail and prison sentences.).

It should also be kept in mind that Ms. Hartley's guideline is influenced by multiple enhancements that are similar in substance. Ms. Hartley is penalized for offense enhancements relating to ongoing discharge, and disposal without a permit. The offense itself is disposal without a permit; that is central to the offense and prosecution of Ms. Hartley. That the disposal occurred multiple times further enhances the guideline, as there was no permit each time. Those two enhancements yield 10 additional levels beyond the base level, which is 8. As such, the enhancements are more impactful than the base level itself. While not considered "double-counting," the enhancements of course feed off the base offense level, which substantially increase the offense level.

When multiple enhancements are applicable that are similar in substance, that can be a reason for a variance. See U.S. v. Jackson, 346 F.3d 22, 26 (2d Cir. 2003) (In fraud case, multiple overlapping enhancements can justify a downward departure. "[A]lthough the enhancements imposed by the District Court are permissible, they are all little more than different ways of characterizing closely related aspects of Jackson's fraudulent scheme. Thus, his base level of 6 was increased 10 levels because his offense involved a large sum of money, another 2 levels because he carefully planned the activity, another 2 levels because he used sophisticated means, and another 4 levels because the scheme was extensive. Even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap. Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive. Moreover, a phenomenon of the Guidelines, graphically illustrated by this case, is that any one enhancement increases the

sentencing range by a far greater amount when the enhancement is combined with other enhancements than would occur if only one enhancement had been imposed.").

Imprisonment would not reasonably accomplish any of the legitimate sentencing objectives, as Ms. Hartley does not present a risk of engaging in similar conduct in the future, she is not a danger to society, she appropriately understands the nature of her misdeeds, and she is committed to paying any financial obligations. Imprisonment would only accomplish an objective of retributive punishment. Further, there are alternative sanctions which would sufficiently punish Ms. Hartley. Thus, a variance is warranted.[6]

### 2. This is Ms. Hartley's First Felony Conviction and She is Unlikely to Reoffend

A downward variance from the applicable sentencing guideline is appropriate when the defendant has little to no criminal history. See U.S. v. Tomko, 562 F.3d 558, 571–72 (3d Cir. 2009) (where defendant was convicted of tax evasion of $225,000 and guidelines were 12 to 18 months, court's sentence to probation on condition of one-year home detention and fine of $250,000 not unreasonable in part because of the defendant's minimal criminal record.).[7] The likelihood that the defendant will engage in future criminal conduct is a central factor that district courts must assess when imposing a sentence. Pepper v. U.S., 562 U.S. 476, 492, 131 S. Ct. 1229, 1242 (2011). In addition, a defendant's age and reduced risk of recidivism are grounds for low-end and below guideline sentences. See U.S. v. Smith, 275 F.App'x 184, 186 (4th Cir. 2008)

---

6 See U.S. v. Haynes, 557 F. Supp. 2d 200, 202–03 (D. Mass. 2008) ("While public safety certainly calls for the incapacitation of some, there is another side to the equation, which, after [Booker] may finally be given the serious consideration it deserves….Courts may no longer ignore the possibility that the mass incarceration of nonviolent drug offenders has disrupted families and communities and undermined their ability to self-regulate, without necessarily deterring the next generation of young men from committing the same crimes.") (alteration added).
7 See also U.S. v. Paul, 561 F.3d 970, 973 (9th Cir. 2009); U.S. v. Autery, 555 F.3d 864, 874 (9th Cir. 2009); U.S. v. Huckins, 529 F.3d 1312, 1319–1320 (10th Cir. 2008).

DEFENDANT'S SENTENCING MEMORANDUM                                                      9

(in child pornography case where guideline sentence was between 78 and 97 months, downward departure to 24 months warranted due to the defendant's advanced age, having avoided violations of law until 64 years of age, and the absence of any risk of recidivism).

Ms. Hartley is currently 35 years old. While Ms. Hartley does have a few misdemeanor convictions from her past (all related to past alcohol abuse), the instant case constitutes her first felony criminal conviction. The fact that she has avoided a felony until her mid-30s is grounds for a downward variance from the guidelines.[8]  Further, prison time is more significant for a first-timer who has not experienced prison than for a defendant who continues to reoffend and be imprisoned. See U.S. v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.")[9].

Ms. Hartley has stable housing, familial support from her family and fiancé, and she has been the primary child caretaker since moving into her current residence with her fiancé. Further, Ms. Hartley has maintained sobriety since her DUII in 2023. She also no longer works in the industry which was the subject of the offense. All of these factors militate towards a minimal risk of re-offending.

Given the extremely minimal risk that Ms. Hartley will ever re-offend, a variance from the applicable guideline range and recommendation of the government is warranted.

---

8 It should be noted that the stigma of a felony conviction is permanent and pervasive, and irreparably damages a person's reputation. U.S. v. Wulff, 758 F.2d 1121, 1125 (6th Cir. 1985); U.S. v. Smith, 683 F.2d 1236, 1240 n.13 (9th Cir. 1982) (internal citation omitted).

9 Congress too has indicated "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…" 28 U.S.C. § 994(j).

DEFENDANT'S SENTENCING MEMORANDUM                                          10

**3. Incarceration is Not Necessary to Protect the Public, and Probation with Conditions is Sufficient Punishment**

Where a defendant is very unlikely to re-offend, poses no danger to the public, and a probation sentence is sufficient to deter, a departure or variance from prison to probation may be appropriate. See U.S. v. Edwards, 595 F.3d 1004, 1016, 1016 n.9 (9th Cir. 2010) (where defendant convicted of bankruptcy fraud and on probation for prior state conviction for fraud and where guidelines range 27 to 33 months, sentence of probation seven months of which was to be served under house arrest, and $5,000 fine, and restitution of $100,000 not abuse of discretion in part because "Section 3553(a), for instance, does not require the goal of general deterrence be met through a period of incarceration," and citing legislative history: "It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose. S. Rep. No. 98-225, at 92.")[10]; U.S. v. Hein 463 F. Supp. 2d 940, 943 (E.D. Wis. 2006) (where defendant convicted of being a felon in possession of ammunition, the guideline term of 12 to 18 months was "greater than necessary to satisfy the purposes of sentencing" in part because "given his minimal prior record and law-abiding life for the past ten years, coupled with his diminished physical capacity, [the court] found that defendant was very unlikely to re-offend and posed no danger to the public. Therefore, prison was not necessary.").

Probation and the conditions that come with probation are onerous in their own right. Such has been recognized by the United States Supreme Court. See Gall v. U.S., 552 U.S. 38, 48,

---

10 See U.S. v. Baker, 502 F.3d 465, 468 (6th Cir. 2007) (in possession of unregistered firearm case where firearm accidentally discharged and guidelines range of 27 to 33 months, a below-guideline sentence of probation with one year of house arrest reasonable in part because incarceration was not necessary to protect the public).

DEFENDANT'S SENTENCING MEMORANDUM                                              11

128 S. Ct. 586, 595–96 (2007) (a sentence of probation is "a substantial restriction of freedom....[and although]...custodial sentences are qualitatively more severe than probationary sentences of equivalent terms[,] [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.... Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.... Most probationers are also subject to individual 'special conditions' imposed by the court.")[11]; U.S. v. Ruff, 535 F.3d 999, 1003–04 (9th Cir. 2008) (citing Gall in support of a sentence of probation with confinement to community treatment center in embezzlement case where guidelines called for 30 to 37 months in prison).

Probation sentences can come with periods of home confinement, community service, fines, and warnings to keep out of trouble, all of which have been done when a prison sentence was prescribed by the advisory guidelines. See U.S. v. Munoz-Nava, 524 F.3d 1137, 1149 (10th Cir. 2008) (in drug case where guidelines 47 to 56 months, district court's sentence of one year and a day in prison and one year home detention reasonable in part because "home confinement and supervised release substantially restrict the liberty of a defendant."); see generally, U.S. v. Prosperi, No. 10-1739, 2012 WL 2866243 (1st Cir. July 13, 2012) (Defendants' sentences of six months of home monitoring, three years of probation, and 1,000 hours of community service for

---

11 The Court in Gall goes on to say, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall v. U.S., 552 U.S. 38, 54, 128 S. Ct. 586, 599 (2007) (internal citation omitted).

mail fraud was substantively reasonable, even though they were an 87-month variance from the bottom of the applicable guidelines range); Tomko, 562 F.3d at 571 (district court did not abuse its discretion in sentencing defendant to probation with a year of home detention, community service, restitution, and fine for tax evasion, rather than to term of imprisonment where guidelines range was 12 to 18 months); U.S. v. Autery, 555 F.3d 864, 876 (9th Cir. 2009) (where defendant convicted of possession of child pornography and where guidelines called for 41 to 51 months, court's sua sponte variance to probation not unreasonable in part because in light of district court's stern warning of a maximum sentence to follow any violation, it was "improbable that the district court's stern warning will be an ineffective deterrent in this case.").

Ms. Hartley has never been in trouble with the law for something like this case, and will very likely never be in trouble ever again. Her past criminal history, of which is minimal, relates to use of alcohol. As a result of this prosecution, Ms. Hartley will be a felon for the rest of her life, which by itself has lasting consequences. See U.S. v. Smith, 683 F.2d 1236, 1240 n.13 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."). A probationary sentence adequately promotes respect for the law, and is an onerous punishment. As is evident from the above caselaw, if sentenced to probation, Ms. Hartley's freedom, even though not confined by prison walls, will be significantly restricted. Ms. Hartley will be subject to supervision and restrictions to ensure that she does not re-offend during her probationary period. There can be little doubt that Ms. Hartley's desistance in the years since this investigation began will continue during any term of probation or supervision imposed.[12]

---

12 While understanding that the conduct as alleged did not immediately cease during the investigation, the conduct did stop in 2020, with the Indictment being handed down in 2025. See Coleman v. Balkcom, 451 U.S. 949, 952, 101 S. Ct. 2031, 2033 (1981) (Stevens, J., concurring) ("The deterrent value of any punishment is, of course, related to

Further, as conditions of probation, there are alternatives to incarceration that would be equally punitive and onerous, such as home confinement. Sentencing Ms. Hartley to house arrest (if deemed necessary beyond a fine) in lieu of prison would allow her to continue caring for her children, which is a circumstance that is favored by Probation Officers around the country. If a fine is imposed, Ms. Hartley is going to owe a substantial amount; monies which she does not currently possess, and which she will have to pay over some time. Therefore, giving Ms. Hartley the opportunity to work off the amount of fine imposed is a more favorable circumstance than having Ms. Hartley sit in prison with no ability to pay. If something like house arrest is imposed[13], such is an onerous punishment in its own right as it is a substantial restriction on one's freedom. See U.S. v. Bueno, 549 F.3d 1176, 1182 (8th Cir. 2008) (affirming downward-departure sentence of five years' probation with house arrest from 108 to 135 months, based in part on defendant's role as the primary caregiver of his infirm wife, and the fact that defendant would be subject to house arrest for the entire probationary period); Munoz-Nava, 524 F.3d at 1149.[14]

---

the promptness with which it is inflicted."); Edwards, 595 F.3d at 1017 (probation with house arrest, fines, and restitution affirmed in part due to nine-year difference between the time of the offense, and time of re-sentencing in the matter, and good conduct while previously on probation); U.S. v. Johnson, 588 F. Supp. 2d 997, 1004 (S.D. Iowa 2008) (in child pornography case where there was a three-year delay between the seizure of defendant's computer and the indictment, and guideline range of 121 to 151 months, sentence of 84 months imposed in part due to the defendant's good behavior during the lengthy delay between seizure and indictment); see also U.S. v Polito, 2007 WL 313463, at *2 (5th Cir. Jan. 31, 2007) (where defendant convicted of possession of child pornography and guidelines 27–33 months, and where offense occurred 6 years before sentencing, district court's sentence of probation with one year house arrest reasonable in part because the six years until conviction and the five years of probation will "give the community a record of eleven years of Polito's conduct" to measure post offense rehabilitation.).

13 Bearing in mind that the Probation Department is not recommending house arrest. It is merely mentioned here as an available option in lieu of prison.

14 See also U.S. v. Coughlin, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) (in embezzlement and tax evasion case with guideline sentence of 33 to 41 months, sentence of probation with 27 months' home confinement imposed due to the severity and retributive nature of the punishment).

In addition, as mentioned above, prison time for a first offender is more significant, has a greater negative impact than someone who has been to prison before, and deterrence is generally served by a shorter sentence for first-timers. See U.S. v. Baker, 445 F.3d 987, 992 (7th Cir. 2006) (court made significant downward departure in part due to fact that the defendant was a first-time offender, prison-time will be tougher on him than for a defendant who had been to prison previously, and consideration of this factor is consistent with the need to reflect a just punishment and adequate deterrence). The United States Sentencing Commission has also recognized that alternatives to incarceration help to prevent contact with more serious offenders, disruption of legal employment, and weakening of family ties. UNITED STATES SENTENCING COMMISSION, STAFF DISCUSSION PAPER, SENTENCING OPTIONS UNDER THE GUIDELINES 19 (1996).

As Ms. Hartley's guideline (Offense Level 12 and Criminal History Category I) is in Zone C, the guidelines, prior to any adjustments made by this Court, do not specifically authorize a sentence of probation. See U.S. SENTENCING GUIDELINES MANUAL § 5B1.1 app. nt. 2. However, the other restrictions outlined in the guidelines, such as the offense being a Class A or B felony, do not apply to Ms. Hartley's case. See id. at 5B1.1(b). There is nothing statutorily prohibiting a sentence of probation; either through the probation statutes or the offense-specific statutes. See 18 U.S.C. §§ 371, 3561(a); 33 U.S.C. §§ 1317, 1319. As such, varying even one level to Offense Level 11 would put Ms. Hartley in Zone B, which via the guidelines, authorizes a sentence of probation. U.S. SENTENCING GUIDELINES MANUAL § 5B1.1(a)(2). Ms. Hartley and the Probation Department jointly maintain that a sentence of probation is entirely appropriate in this case.

DEFENDANT'S SENTENCING MEMORANDUM                                          15

Therefore, a variance from the guidelines is warranted, as probation with conditions is an appropriate and just punishment, and probation is a viable and sufficiently punitive alternative to incarceration.

### 4. The Impact on Ms. Hartley's Family Should be Considered

Where a defendant's family is extraordinarily impacted by an incarceration sentence, a departure or variance from the guidelines may be permitted. U.S. SENTENCING GUIDELINES MANUAL § 5H1.6 app. nt. 1 (2018) (Although family ties and responsibilities are not ordinarily relevant to the sentencing determination, the court is to take all circumstances into consideration, including the seriousness of the offense, danger to a defendant's family as a result of the offense, and whether the defendant's incarceration will create a substantial hardship (financially or otherwise) to the defendant's family that substantially exceeds that which is ordinarily incident to a similarly-situated defendant, among other factors.))[15]; see U.S. v Schroeder, 536 F.3d 746, 756 (7th Cir. 2008) ("The court's observation that Schroeder's criminal conduct was the cause of the alleged hardship to his daughter is an obvious and not dispositive one, since the culpability of a defendant who appears for sentencing is a given. When a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members."); U.S. v. Milikowsky, 65 F.3d 4, 7 (2d Cir. 1995) ("Among the permissible justifications for downward departure ... is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties.").[16]

---

15  The Defense recognizes section 5H has been deleted from the current Sentencing Guidelines.
16  See also U.S. v. Gauvin, 173 F.3d 798, 808 (10th Cir. 1999) (In assault with dangerous weapon case, three-level downward departure to 37 months affirmed in part based on the extraordinary family responsibilities of the

DEFENDANT'S SENTENCING MEMORANDUM                                                                 16

Under the recommendation of the Government, Ms. Hartley stands to be removed from her family for up to 4 and a quarter months, when considering the potential 15% credit for good behavior. Ms. Hartley had a child in April of 2025 (prior to Indictment and prosecution) after losing a baby due to a miscarriage at 14 weeks. She is currently a stay-at-home mom to her baby who is solely breastfeed[17], and two other step-children. Her 9-year-old step-son is nonverbal autistic and Ms. Hartley is his main caregiver and chauffeur to all his appointments and medical treatments, as well as speech therapy classes twice a week. Ms. Hartley's step-daughter is 11 and Ms. Hartley is her transportation as well. Ms. Hartley's fiancé is the sole financial provider for the family and runs a small plumbing business, working 6 to 7 days a week. Ms. Hartley's role then in the family is to care for the children, especially with the special needs of her step-son, which are beyond the regular and routine needs of children without disabilities. Ms. Hartley also takes care of her fiancé's step-children on weekends, as the children's mother struggles with addiction.

Ms. Hartley, by all accounts, is a good mother, which of itself carries importance in determining the appropriate sentence. See U.S. v. Pauley, 511 F.3d 468, 474–75 (4th Cir. 2007) (in child pornography case where guidelines called for 78 to 97 months, departure to 42 months affirmed in part due to defendant being a good father, which is a valid consideration under 18 U.S.C. § 3553(a)).

Therefore, Ms. Hartley's family is going to suffer mightily without Ms. Hartley's presence. See U.S. v. Husein, 478 F.3d 318, 327 (6th Cir. 2007) (in drug case where guidelines

---

defendant, and to minimize the impact of the sentence to defendant's family.).

17  Ms. Hartley nurses her baby 2 to 3 times per night, and 2 to 3 times during the day, if not more. She also co-sleeps with her baby.

DEFENDANT'S SENTENCING MEMORANDUM                                                     17

prescribed 40 months, sentence of one day in prison and 270 days home confinement reasonable due to extraordinary family circumstances where defendant cared for her seriously ill father and incarcerating the defendant would have put the entire family on welfare.). It must also not be forgotten that the incarceration of a parent has deleterious effects on children, particularly those of a young and impressionable age such as Ms. Hartley's stepchildren and infant biological child. See U.S. v. Haynes, 557 F. Supp. 2d 200, 203 (D. Mass. 2008) ("Courts may no longer ignore the possibility that the mass incarceration of nonviolent drug offenders has disrupted families and communities and undermined their ability to self-regulate, without necessarily deterring the next generation of young men from committing the same crimes."); see also EXECUTIVE OFFICE OF THE PRESIDENT OF THE UNITED STATES, ECONOMIC PERSPECTIVES ON INCARCERATION AND THE CRIMINAL JUSTICE SYSTEM, EXECUTIVE SUMMARY 5 (April, 2016), *available at* https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160423_cea_incarceration_ criminal_justice.pdf ("Parental incarceration is a strong risk factor for a number of adverse outcomes, including antisocial and violent behavior, mental health problems, school dropout, and unemployment.").

Society as a whole will be better off if Ms. Hartley takes care of her children. See U.S. v. Husein, 478 F.3d 318, 331 (6th Cir. 2007) (citing U.S. v. Menyweather, 431 F.3d 692, 701 (9th Cir. 2005) (in drug case where guidelines prescribed 40 months, court found the defendant's family would benefit more by her presence than society would benefit from her incarceration.)).

In order to account for the responsibilities that Ms. Hartley has towards her family, which were not present at the time of the offense, a variance is warranted to reflect those extraordinary family circumstances.

**5. Ms. Hartley's Role in the Offense should be Considered**

Ms. Hartley's role in the offense should be considered in fashioning an appropriate sentence in this case. See U.S. v. Jimenez-Gutierrez, 491 F.3d 923, 926, 929 (8th Cir. 2007) (where defendant pled guilty to conspiracy to distribute more than fifty grams of meth, and where guidelines 188 to 220 months, court's sentence of 96 months proper in part because court could determine that guideline sentence was too harsh because did not account for fact that higher-ups in the conspiracy who had to exist deserved much more time.); see also U.S. v. Smart, 518 F.3d 800, 810 (10th Cir. 2008) (42-month downward variance not an abuse of discretion in sex offense case where the defendant was less culpable than the co-defendant).

While Ms. Hartley's role in the offense is not directly in dispute, it is important to note that her conduct was not simply of her own doing or devise. Indeed, others were involved who are deceased, and/or who are not being prosecuted as a conspirator.

Ms. Hartley took direction primarily from her father, Jamie Hartley, as well as Dr. Timothy Bauters. Despite her label of Operations Manager, Ms. Hartley was not the decisionmaker as to much of what went on at NWSS. It is our position that her role as presented by the government is, respectfully, overblown. Dr. Bauters crafted and signed the original permit to CWS. Dr. Bauters also created the "treatment" process for which the wastewater was to be treated. At a presentation at PCC, which Ms. Hartley did attend but did not specifically present at, Dr. Bauters explained his process to PCC, and as a result, PCC decided to have its wastewater treated at NWSS. Of course, NWSS did not have a permit to accept PCC wastewater. After Dr. Bauters passed away, Ms. Hartly copied and pasted his permit application, and signed her name.

As to the treatment itself, and again, despite not having a permit, Ms. Hartley thought the wastewater was coming out clean due to the representations of Dr. Bauters.

Jamie Hartley, Ms. Hartley, and others, did question whether what was happening at NWSS, under the direction of Dr. Bauters, was legal. Ms. Hartley herself, in an email, expressed that she did not want to go to jail over what was going on; not having a permit yet accepting the wastewater. However, everyone was assured that everything "would be ok." Ms. Hartley followed the direction of her father and Dr. Bauters accordingly.

Ms. Hartley herself did not have primary decision-making authority; everything went through her father and Dr. Bauters. It is accurate that Ms. Hartley generally ran the business at NWSS, especially after the deaths of her father and Dr. Bauters, but she was not the leader/organizer nor the primary wrong-doer.

As such, Ms. Hartley's role in the offense, and the actions of others who managed the scheme, should be considered in determining the appropriate sentence.

### 6. Ms. Hartley's Motivations and Intentions Should be Considered

A defendant's motive in committing the offense is an important factor in determining the appropriate sentence. Wisconsin v. Mitchell, 508 U.S. 476, 485, 113 S. Ct. 2194, 2199 (1993) (citing 1 W. LeFave & A. Scott, SUBSTANTIVE CRIMINAL LAW § 3.6(b), p. 324 (1986) ("Motives are most relevant when the trial judge sets the defendant's sentence, and it is not uncommon for a defendant to receive a minimum sentence because he was acting with good motives, or a rather high sentence because of his bad motives")); U.S. v. Milne, 384 F. Supp. 2d 1309, 1312 (E.D. Wis. 2005) (in bank fraud case a mitigating factor is that the defendant did not spend the bank's money on luxury items but rather to prop up a failing business. "With their almost singular focus

on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability."); see also U.S. v. Ranum, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (below guideline sentence warranted in fraud case where defendant "did not act for personal gain or for improper personal gain of another.").

In the present case, Ms. Hartley did not act with a criminal motive to pollute the environment. As noted above, while there were misstatements made, both orally and in writing, the motivations were to keep the business going in the way she had been shown by others. As noted above, Ms. Hartley thought that the process from Dr. Bauters was creating something that was not so harmful to the environment. Moreover, it was not as if the business was making substantially more than it did prior to the PCC contract. It is also noteworthy that the dumping of PCC waste ceased prior to the conclusion of the investigation, and prior to Grand Jury. A few years went by between the unlawful conduct and prosecution, without the need for immediate intervention to prevent further harm.

Ultimately, Ms. Hartley used poor judgment in continuing what had been put in motion by others. That fact has been taken into account when imposing a sentence. See U.S. v. Kathman, 490 F.3d 520, 526 (6th Cir. 2007) (where defendant pled guilty to involuntary manslaughter in a drunk-driving incident, and guidelines 42 to 51 months, a below-guideline sentence was appropriate, in part, where court found the defendant to be an otherwise law-abiding young man who used poor judgment); U.S. v. Hadash, 408 F.3d 1080, 1084 (8th Cir. 2005) (in possession of stolen firearms case, and guidelines 12 to 18 months, 6-level downward departure not unreasonable, in part, as the defendant did an "incredibly dumb thing," and he was "not the type of defendant the guidelines section was designed to punish).

DEFENDANT'S SENTENCING MEMORANDUM                                                                21

While Ms. Hartley certainly acknowledges and accepts that what she did was indeed criminal, the intentions behind it were not so nefarious. As such, the fact that her motivations and intentions were not inherently criminal warrants a variance in this particular case.

### 7. Probation Office Recommends a Below-Guideline Sentence

Where the Probation Department recommends a sentence below the applicable guidelines range, a departure or variance is warranted to reflect such recommendation. See U.S. v. Willis, 479 F. Supp. 2d 927, 937 (E.D. Wis. 2007) (where guidelines range 120 months, and 60-month statutory maximum, downward departure to one year and one day in prison reasonable in part because sentence consistent with the recommendation of the probation officer, whose view of the offense and the offender were taken into account); Hein, 463 F. Supp. 2d at 943 (in felon in possession of ammunition case, and guidelines 12 to 18 months, a sentence of probation was appropriate in part due to the recommendation of the probation officer, especially since a probation recommendation below the guidelines in the post-Booker era is "quite rare.").

The Probation Department is recommending a sentence of 5 years of probation and a $25,000 fine. That is a 10-month variance from the applicable sentencing guideline, taking into account acceptance of responsibility and the early case resolution departures/variances. U.S. Probation Officer Kendra Carlson provided a detailed explanation for the variance in the Pre-Sentence Report. Probation Officer Carlson took into account the seriousness of the offense and the kinds of sentences available, but also acknowledged the sentencing factors in 18 U.S.C. § 3553(a).

The defense agrees with the Probation Department that a probationary sentence with a fine is totally appropriate in this case. This is so primarily for all the reasons explained in the

Pre-Sentence Report, as well as those outlined in this memorandum. The fact that Ms. Hartley has accepted responsibility, has a limited criminal history, and has a history of stable employment and housing, all weigh in favor of a sentence of Probation. In addition, the Pre-Sentence Report took into account the need to avoid unwarranted disparities in sentencing like-offenders for like-offenses. There are very few cases that fall under guideline 2Q. Those that have, the common theme is that, if sentenced to incarceration, the time in custody is 2 months or less; regardless of what the guidelines prescribe. As stated above, Mr. Hartley has extraordinary caregiving responsibilities, which were not in-play during commission of the offense. Therefore, and while the Defense does not know the circumstances of the sentences in those other cases, Ms. Hartley should be sentenced to probation with no incarceration.

Ms. Hartley has shown that she is capable of behaving appropriately and will be compliant with any conditions placed upon her while on supervision post-sentencing. The question is, is prison necessary for Ms. Hartley to get the message? The answer is emphatically no. There are constraints and consequences that can be meted out by a probationary sentence that are onerous enough to promote respect for the law and to adequately punish Ms. Hartley for her conduct. Any prison time would not serve any legitimate purpose other than retributive punishment, which is not necessary in this case, given the positive steps taken by Ms. Hartley since the instant offense occurred.

Therefore, given that the Probation Department is recommending a probationary sentence, and since Ms. Hartley can be counted on to follow the rules, a sentence of probation with a fine is warranted.

/////

DEFENDANT'S SENTENCING MEMORANDUM                                              23

**8. Mercy is Warranted**

Ms. Hartley seeks the mercy of this Court. American sentences have been characterized as particularly long, harsh, and lack an individualistic character to them; causing courts to treat offenders as less than human beings. These were the sentiments of United States Supreme Court Justice Anthony Kennedy in 2007, when he expressed these feelings to the United States Senate Judiciary Committee. See also JAMES Q. WHITMAN, HARSH JUSTICE 19, 223 n.72 (2003) ("American punishment is comparatively harsh, comparatively degrading, comparatively slow to show mercy," "the makers of sentencing guidelines succeeded only in contributing to the making of a law of punishment that shows obstinately little concern for the personhood of offenders...a law that tends to treat offenders as something closer to animals than humans, and that has correspondingly sought, more and more frequently, simply to lock them away.").

Yes Ms. Hartley made some big errors, and she allowed wastewater to be dumped without a permit. This was admittedly a very poor move, and criminal, and one that Ms. Hartley will regret for the rest of her life. However, given Ms. Hartley's lack of criminalistic attitude and familial responsibilities now which she did not have during the offense, experience teaches that Ms. Hartley is very unlikely to re-offend. Ms. Hartley seeks the mercy of this Court to sentence her appropriately; to go below the recommendation of the government, and to impose a sentence of probation as recommended by the Probation Department, given all the facts and circumstances.

G.     CONCLUSION

Kayla Hartley committed the crime of Conspiracy to Commit a Clean Water Act Violation. Almost 500,000 gallons of wastewater was unlawfully permitted to be dumped at

DEFENDANT'S SENTENCING MEMORANDUM                                    24

NWSS without proper authorization. Ms. Hartley has tarnished herself forever. However, Ms. Hartley has taken steps to remove herself from the underlying conduct and industry, and to bolster her life circumstances moving forward. Ms. Hartley has no felony criminal history, she has been sober since her last DUII charge in 2023, she has extraordinary familial responsibilities, and she lacks a criminalistic attitude. For many reasons, a probationary sentence is appropriate and proper in this case.

When one considers the policies enacted as part of 18 U.S.C. § 3553(a), there are more than ample grounds to impose a sentence of probation. Such is consistent with §3553(a), Ms. Hartley's individual characteristics, her familial responsibilities, to enable the ability to make future payments towards her fines and fees; all among a myriad of other reasons, and such a sentence promotes respect for the law. A probationary sentence adequately achieves the purposes of sentencing. Therefore, we respectfully request that the Court impose a sentence of probation, as recommended by the Probation Department.

DATED:        Portland, Oregon
              May 5, 2026

Respectfully submitted by:
s/d Jeffrey A. Turnoy
Mark C. Cogan, P.C.
OSB #124814
Attorneys for KAYLA HARTLEY

DEFENDANT'S SENTENCING MEMORANDUM                                      25